UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN T. CAMPIONE and ANNA CAMPIONE, his wife,<br><br>Plaintiffs,<br><br>v.<br><br>GLENN A. KIVATISKY, JOHN DOE 1-10, WESTFIELD GARDEN STATE PLAZA,[1] RUBY TUESDAY'S, ROBERT ROE 1-10, and ABC CORP. 1-10,<br><br>Defendants. | Civil Action No. 09-2019 (SDW) (MCA)<br><br>**OPINION**<br><br>July 19, 2011 |

**WIGENTON**, District Judge.

Before the Court is Defendant Ruby Tuesday's ("Defendant" or "Ruby Tuesday's") Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(c) ("Motion"). This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Venue is proper pursuant to 28 U.S.C. § 1441(a). The Motion is decided without oral argument pursuant to Fed. R. Civ. P. 78. For the reasons stated below, this Court grants Defendant's Motion.

**FACTUAL AND PROCEDURAL HISTORY**

This dram shop action arises out of an accident that occurred on December 22, 2007. On that day, Glenn Kivatisky's ("Kivatisky") truck struck the left rear bumper of Police Officer John Campione's patrol car at about 6:22 p.m. on Route 17 near the Garden State Plaza Mall in Paramus, New Jersey. (Def.'s Ex. B at 1.) When responding officers approached Kivatisky,

---

[1] This Court granted Defendant Westfield Garden State Plaza's Motion for Summary Judgment on September 20, 2010. (Docket Entry No. 48.) Therefore, it is no longer a Defendant in this action.

1

they detected a "strong odor" of alcohol on him. The officers also noticed that Kivatisky was swaying, his eyes were watery, and his speech was "slow and slurred." (Id. at 2.) Additionally, they observed that there was an open cooler in the front passenger seat of Kivatisky's vehicle containing water and several bottles of beer. (Id.; Def.'s Ex. L, Kivatisky Dep. 106:21-23.) The cooler was positioned such that the person in the driver's seat of the vehicle could reach over to the passenger side and access its contents. (Def.'s Ex. L, Kivatisky Dep. 107:6-11.) They also noticed that there was an open bottle of beer in the cup holder in the center console of Kivatisky's vehicle. (Id.; Def.'s Ex. G at 1.) Furthermore, the officers found eight empty twelve-ounce beer bottles in the vehicle. (Def.'s Ex. E; Def.'s Ex. G at 2-3.)

Subsequently, Kivatisky was transported to the Paramus Police Department and underwent breathalyzer tests. The tests were administered at 7:20 p.m. and 7:30 p.m. and both tests revealed that Kivatisky's blood alcohol concentration ("BAC") was .26%. (Def.'s Ex. D.) Kivatisky reported during the breathalyzer exam that he drank five or six beers between 3:00 p.m. and 4:00 p.m. (Def.'s Ex. K). However, he later testified that he could not remember if he provided the police with accurate information when he was questioned. (Pl.'s Ex. B, Kivatisky Dep. 69:16-23.) Subsequently, at around 8:46 p.m. Kivatisky was interviewed by two detectives. During the interview, Kivatisky asserted that he had been at Ruby Tuesday's around 3:00 p.m. on that day, and he had drank about three or four beers while he was there. (Def.'s Ex. J at 2.) Kivatisky insisted that he only drank at Ruby Tuesday's. (Def.'s Ex. J at 3.) However, when questioned about the open beer bottle found in the console of his vehicle, Kivatisky answered that "he did not think he drank while he was driving to the mall but [] it was 'possible' that he had consumed some of the alcohol while driving through Paramus." (Id. at 2.)

2

Nonetheless, later, during his deposition, Kivatisky testified that he drank no more than four beers on the day of the accident, and he could not remember if he drank any of the beer in the cooler. (Def.'s Ex. L, Kivatisky Dep. 52:7-10, 109:18-24.) Furthermore, he testified that he did not show any signs of intoxication when he was at Ruby Tuesday's. (Id. at 36:22-37:8.) He also stated that he could not recall the time he went to Ruby Tuesday's. (Id. at 23:8-14.) Although there was a receipt in Kivatisky's vehicle showing that he made a purchase at a McDonald's restaurant at 4:23 p.m., Kivatisky could not account for his whereabouts after 4:30 p.m. (Id. at 49:11-14, Def.'s Ex. I.)

Plaintiffs John Campione and Anna Campione ("Plaintiffs") offer Francis X. Tobey, Jr. ("Tobey") as an expert on the issue of whether Kivatisky was served alcohol at Ruby Tuesday's when he was visibly intoxicated. Tobey prepared a report in which he concluded that Kivatisky "would have been perceived to have been obviously impaired prior to the accident when he had been a patron of Ruby Tuesday's." (Def.'s Ex. M at 3.) In coming to this conclusion, Tobey relied on the Paramus police reports, Kivatisky's answers to interrogatories, the transcript of Kivatisky's deposition, and Kivatisky's statement during the interview following his arrest. (Id. at 1.) Tobey noted that to possess a BAC of .26%, Kivatisky "would have had to [] consume[] between fourteen and fifteen 12 oz. bottles of beer for a total of 168 oz. to 180 oz. of beer" between 3:00 p.m. and 4:00 p.m. (Id. at 2.) Therefore, Tobey acknowledged that Kivatisky's statement to the police about the number of beers he drank that day was inconsistent with his breath test results. (Id.)

According to Tobey, the two probable scenarios were that Kivatisky either "consumed a substantial amount of alcohol prior to visiting Ruby Tuesday's or had consumed, at least, fourteen 12 oz. beers at Ruby Tuesday's." (Id.) However, Tobey pointed out that there was no

3

evidence indicating that Kivatisky consumed alcohol prior to going to Ruby Tuesday's. (Id.; Def.'s Ex. O, Tobey Dep.15:25-26:2.) Tobey concluded that under either scenario, Kivatisky "most probably would have exhibited obvious alcohol impairment while at Ruby Tuesday's." (Def.'s Ex. M at 2.) Although Tobey acknowledged that eight empty beer bottles were found in Kivatisky's vehicle, he placed heavy reliance on Kivatisky's statement that he only drank at Ruby Tuesday's. (Def.'s Ex. M at 2; Def.'s Ex. O, Tobey Dep. 20:10-11.)

During Tobey's deposition, he conceded that although he placed a significant emphasis on Kivatisky's testimony, there were inconsistencies in that testimony. (Def.'s Ex. O, Tobey Dep. 14:23-24.) Additionally, he testified that if Kivatisky drank only six beers while he was at Ruby Tuesday's he would not have exhibited signs of visible intoxication. (Id. at 34:12-21.) Tobey also stated that he did not "know whether to believe" Kivatisky's statement that he did not drink while he was in his vehicle. (Id. at 20:24-25.) For instance, when asked: "And when [Kivatisky] [] says he didn't drink any beers in his truck, you assume that fact as true?" Tobey answered: "I don't think so." (Id. at 19:24-20:1.) Furthermore, Tobey testified that he did not know the number of beers Kivatisky consumed at Ruby Tuesday's. (Id. at 26:6-13.) Similarly, he admitted that he had no knowledge of the number beers Kivatisky may have consumed between 4:00 p.m. and 6:00 p.m. (Id. at 51:23-25.)

Defendant's expert Dr. Edward J. Barbieri ("Dr. Barbieri") also prepared a report. Dr. Barbieri, like Tobey, concluded that Kivatisky's BAC was inconsistent with his statement that he only drank four or five beers on the day of the accident. (Pl.'s Ex. E at 4.) Dr. Barbieri also concurred with Tobey's conclusion that Kivatisky did not "consume[] alcohol prior to Ruby Tuesday's." (Id. at 6.) He found that Kivatisky may have consumed about twelve to thirteen alcoholic drinks. (Id. at 5.) However, he stated that "it is not logical to conclude that Mr.

Kivatisky consumed all of these beers . . . within an hour at Ruby Tuesday['s]." (Id.) Dr. Barbieri noted that eight empty beer bottles were found in Kivatisky's vehicle. Consequently, he concluded that Kivatisky may have "consumed some or all of these beers or some other alcoholic beverages that afternoon." (Id.) According to Dr. Barbieri, Kivatisky's BAC "had to be from a combination of some beer . . . he said he consumed at Ruby Tuesday['s] and the majority elsewhere. Mr. Tobey has focused entirely on Mr. Kivatisky consuming all of the drinks at Ruby Tuesday['s] (which is not fit with the evidence in this case)." (Id. at 6.) Additionally, unlike Tobey, he concluded that "there is no definitive, factual evidence that indicates that" Kivatisky was visibly intoxicated when he was at Ruby Tuesday's. (Id. at 4.)

**STANDARD OF REVIEW**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." Id. at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its

5

burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Once the moving party meets its initial burden, the burden then shifts to the non-movant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculation, unsupported assertions or denials of its pleadings. Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (quoting Celotex Corp., 477 U.S. at 325). Further, the nonmoving party is required to "point to concrete evidence in the record which supports each essential element of its case." Black Car Assistance Corp. v. New Jersey, 351 F. Supp. 2d 284, 286 (D.N.J. 2004). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof," then the moving party is entitled to judgment as a matter of law. Celotex Corp., 477 U.S. at 322-23.

**DISCUSSION**

    **1. The Admissibility of Tobey's Report and Testimony**

The introduction of expert testimony is governed by Fed. R. Evid. 702. "Rule 702 has three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and

(3) the expert's testimony must assist the trier of fact." Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008).  The third requirement is referred to as "fit."  United States v. Schiff, 602 F.3d 152, 172 (3d Cir. 2010).  "In assessing whether an expert's testimony 'fits,' we are asking 'whether [the] expert testimony proffered . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'"  Id. (alterations in original) (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 591 (1993).

      **a. Tobey's Qualifications**

Defendant maintains that Tobey's testimony should be excluded because he is not qualified to testify about pharmacokinetics.  (Def.'s Br. 11.)  Plaintiffs bear the burden of proving that Tobey's testimony is admissible by a preponderance of the evidence.  See B. Braun Melsungen AG v. Teramo Med. Corp., 749 F. Supp. 2d 210, 222 (D. Del. 2010) (citing Daubert, 509 U.S. at 592 n.10). The Third Circuit has instructed that courts should interpret the qualification requirement "liberally" and not insist on a certain kind of degree or background when evaluating the qualifications of an expert.  Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998). Although the Third Circuit has espoused a liberal policy with expert qualifications, every proffered witness is not qualified as an expert.  "[A]t a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman."  Aloe Coal Co. v. Clark Equip. Co., 816 F.2d 110, 114 (3d Cir. 1987).  In order to be qualified as an expert, Rule 702 requires a witness to have "'specialized knowledge' regarding the area of testimony.  The basis of this specialized knowledge 'can be practical experience as well as academic training and credentials."  Waldorf, 142 F.3d at 625 (quoting American Tech. Resources v. United States, 893 F.2d 651, 656 (3d Cir. 1990)).  The Third Circuit has also "stress[ed] that ordinarily an otherwise

7

qualified witness is not disqualified merely because of a lack of academic training." Waldorf, 142 F.3d at 626.

Tobey is a retired police trooper. Although he maintains that he currently "consult[s] with attorneys involved in DWI defense and alcohol related civil ligation, (Def.'s Ex. N at 6), most of his experience and expertise appears to be in the area of breath testing, field sobriety testing, and the maintenance and operation of breath testing devices. (See Pl.'s Ex. A, Tobey Dep. 44:12-45:4.) For instance, while he was a police trooper, Tobey was responsible for inspecting the calibration, maintenance and repair of breathalyzer devices. (Def.'s Ex. N at 6.) He also asserts that he provided lectures on driving under the influence, breath testing, and DWI defense. (Id. at 6-7.) Moreover, most of the training and courses Tobey has participated in were related to breath testing and the maintenance and operation of breath testing devices. (Id. at 5-6.) In fact Tobey admits that "[t]he majority of [] [his] listed training since August 1990 deals with state of the art infrared and electro-chemical breath testing devices . . . ." (Id. at 7.) Tobey does not have a science background and he does not have any expertise or experience in pharmacokinetics. Therefore, the Court finds that he is not qualified to testify as an expert in pharmacokinetics.

Although this Court concludes that Plaintiffs' proffered expert is unqualified, it will nonetheless, analyze the reliability of his conclusions.

### b. Reliability of Tobey's Conclusions

In determining whether an expert's conclusions are reliable, the court has to examine whether the expert has "good grounds" for his or her conclusions. In Re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 742 (3d Cir. 1994) (quoting Daubert, 509 U.S. at 590). "The focus is 'not on what the experts say, but what basis they have for saying it.'" Diaz v. Johnson Matthey,

8

Inc., 893 F. Supp. 358, 373 (D.N.J. 1995) (quoting Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1316 (9th Cir. 1995)).

There is no dispute that Kivatisky would not have been visibly intoxicated at Ruby Tuesday's if he only drank six bottles of beer while he was there. (Def.'s Ex. O, Tobey Dep. 34:12-21; Pl.'s Ex. E at 7-8.) Additionally, both Tobey and Dr. Barbieri agree with Kivatisky's assertion that he did not consume any alcohol prior to going to Ruby Tuesday's. (Pl.'s Ex. E at 6.) Therefore, the issue here is whether Kivatisky consumed all of the alcohol while he was at Ruby Tuesday's or whether he drank somewhere else after he left Ruby Tuesday's.

The Court notes that Tobey's extrapolation that Kivatisky consumed more than four or five bottles of beer is accurate, and is not disputed by Defendant's expert, Dr. Barbieri. However, the Court finds that Tobey's conclusion that Kivatisky drank "between fourteen and fifteen 12 oz. bottles of beer for a total of 168 oz. to 180 oz. of beer" while at Ruby Tuesday's between 3:00 p.m. to 4:00 p.m. is unreliable because he bases his conclusions primarily on Kivatisky's inconsistent and unreliable statements. Although Kivatisky insists that he only drank at Ruby Tuesday's, the record indicates that eight empty beer bottles were found in his vehicle and there was an open bottle of beer in the cup holder in his vehicle. Kivatisky states that he drove alone on the day of the accident. Moreover, in his interview with the police immediately after his arrest, he told them that "it was 'possible' that he had consumed some of the alcohol while driving through Paramus." (Def.'s Ex. J at 2.) Additionally, during his deposition, Kivatisky did not deny drinking the beers that were in the cooler. Instead, he testified that he did not remember if he did. (Def.'s Ex. L, Kivatisky Dep. 109:18-110:6.) Tobey acknowledges that Kivatisky's statements are inconsistent and he also states that he does not "know whether to believe" Kivatisky's statement that he did not drink while he was in his vehicle. (Def.'s Ex. O,

9

Tobey Dep. 20:24-25.) The unreliability of Tobey's conclusions is further demonstrated by the following exchange:

> Q. Okay. So you believe him on the one hand when he tells you that he started drinking at 3:00 . . . and you also believe him when he says he didn't drink any of the beers or the empty bottles in the car?
> A. I don't believe him, period. Okay. What I'm saying to you is that he had to consume a certain amount of alcohol to get a .26, okay? What he says is he started drinking at Ruby Tuesday's at 3:00, so he either had to drink a lot of beer at Ruby Tuesday's or he had to have a blood alcohol concentration before going to Ruby Tuesday's or he had to have something to consume after.
> Q. Okay.
> A. And I don't know what it is because I wasn't there.
> Q. Okay. So there's (sic) three scenarios then. He either drank before he went to Ruby Tuesday['s] and then drank a certain amount of beer at Ruby Tuesday['s], or he drank some at Ruby Tuesday['s] and then drank afterwards?
> A. Actually, there's a third. He's an alcoholic and could have drank all day.

(Id. at 30:7-31:8.)

Even Plaintiffs concede that "the reliability of some of Mr. Kivatisky's recollections regarding certain events of December 22, 2007 are somewhat spotty." (Pl.'s Br. 18). Nonetheless, Tobey picks and chooses which of Kivatisky's inconsistent statements he wants to rely on without providing any basis for his decision. Tobey's complete reliance on Kivatisky's testimony to the exclusion of the other facts in the record makes his opinion unreliable.

As Dr. Barbieri points out, "it is not logical to conclude that Mr. Kivatisky consumed [twelve or more beers] . . . within an hour at Ruby Tuesday['s]." (Pl.'s Ex. E at 5.) This is true especially in light of the fact that there was a cooler containing beer and empty bottles of beer found in Kivatisky's vehicle. The record shows that Kivatisky made a purchase at a McDonald's restaurant located in Ramsey, New Jersey at 4:23 p.m. on the date of the accident. (Def.'s Ex. I.)

This McDonald's is about thirteen miles north of the Garden State Plaza Mall.  (Def.'s Br. 3.)  Therefore, it is possible that Kivatisky left Ruby Tuesday's at 4:00 p.m. as he claims.  However, neither Kivatisky nor Tobey can account for what happened between 4:00 p.m. and the time of the accident, and the Court is uncertain as to when Kivatisky drank the beer found in his vehicle.  Hence, the Court finds that Tobey's conclusions are based on speculation and unreliable, inconsistent testimony.[2]  See Bauer v. Nesbitt, 198 N.J. 601, 614 (2009) (finding that the plaintiff's expert opinion was speculative because the decedents' conduct "in the hour immediately before the accident remains somewhat of a mystery.").

**2. Ruby Tuesday's is Entitled to Summary Judgment**

The Dram Shop Act imposes liability on an alcoholic beverage server if it serves a visibly intoxicated person.  N.J. Stat. Ann. 2A:22A-5(b).  As stated earlier, there is no evidence in the record suggesting that Kivatisky consumed alcohol before he went to Ruby Tuesday's.  Furthermore, Kivatisky testified that he did not show signs of intoxication when he was at Ruby Tuesday's.  Moreover, Plaintiffs have not produced any witness testimony stating that Kivatisky was served alcohol at Ruby Tuesday's while he was visually intoxicated.  There is no genuine dispute as to any material fact and other than their expert testimony, which this Court had found unreliable, Plaintiffs have not provided any evidence demonstrating that Kivatisky was served alcohol at Ruby Tuesday's while he was visibly intoxicated.

Furthermore, even though Kivatisky asserts that he only drank at Ruby Tuesday's, he also maintains that he was not intoxicated and he did not show any signs of intoxication while he was there.  However, Plaintiffs maintain that Ruby Tuesday's served Kivatisky alcohol while he was visibly drunk because Kivatisky had a BAC of .26% and he claims to have only drank at

---

[2] Because the Court finds that Tobey's conclusions are unreliable, it will not address Defendant's other arguments as to why his testimony should be excluded.

11

Ruby Tuesday's. (Pls.' Br. 19.) This argument suffers from the same deficiency as Tobey's conclusions. Plaintiffs acknowledge that Kivatisky's account of what occurred on the day of the accident is "spotty." (Pls.' Br. 18.) Nonetheless, they ask the Court to rely on some of Kivatisky's statements and not others without providing any basis for why parts of his testimony should be credited. Plaintiffs have failed to establish that Ruby Tuesday's served Kivatisky alcohol while he was visibly drunk. Consequently, Defendant is entitled to summary judgment.

**CONCLUSION**

For the above stated reasons, Defendant's Motion is GRANTED.

**SO ORDERED.**

s/ Susan D. Wigenton
**Susan D. Wigenton, U.S.D.J.**

cc: Madeline Cox Arleo, U.S.M.J.